# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
### 3:11-cv-12-RJC-DSC

| | |
|---|---|
| ASGHAR OSCAR SAFARI, | ) |
| Plaintiff, | ) |
| v. | ) ORDER |
| COOPER WIRING DEVISES, INC. | ) |
| Defendant. | ) |

**THIS MATTER** comes before the Court on Defendant Cooper Wirings Devices, Inc.'s ("Defendant") Motion for Summary Judgment, (Doc. No. 42), Defendant's Motion to Dismiss, (Doc. No. 29), and the Magistrate Judge's Memorandum and Recommendation ("M&R"), recommending that this Court deny Defendant's Motion to Dismiss, (Doc. No. 38).

## I. BACKGROUND

Plaintiff Asghar Oscar Safari ("Plaintiff") served as a Quality Control Manager at Defendant's distribution facility from 1999 until August 2008. (Doc. No. 49). He was terminated in August 2008. Defendants have cited Plaintiff's poor judgment and mishandling of a sexual harassment complaint made to him by Patricia Owens ("Owens") against a third employee, Mahmood Davani ("Davani"), as its reason for terminating Plaintiff's employment. (Doc. No. 43-3 at 53, 57). Plaintiff's supervisors also expressed concern about the Plaintiff's own behavior with Owens. (Id.).

Plaintiff managed the returned goods area ("RGA"), verified incoming products, approved the product's distribution, and handled customer complaints. (Doc. No. 43-2 at 7: Plaintiff Dep.). From 2004 until November 2007, Plaintiff was responsible for supervising Owens. (Id. at 15). Plaintiff admitted that he told Owens that he had a dream about her on at

least one occasion while Owens was under his supervision. (Id. at 29-30). Plaintiff testified that he told Owens that in the dream he, Owens, and Plaintiff's wife were at a wedding or a party and that Owens wore a pink dress while Plaintiff's wife wore a blue dress. (Id.). Plaintiff testified that he could tell that his dream made Owens uncomfortable. (Id. at 31).

Plaintiff also admits that Owens made complaints to him in two meetings during his employment. (Id. at 26, 33). Plaintiff was Owens's superior during the first meeting. In that meeting, Owens complained about a comment made by Davani. (Id. at 26). Plaintiff testified that Owens told him "[Davani] insulted me. He made me - - he made me feel bad. He did not say word." (Id. at 27). Owens testified that she told Plaintiff that Davani suggested that Davani, Plaintiff, and Owens "get naked together." (Id.). Plaintiff testified that he told Owens that Davani would never had said such a thing, but also claims that Owens never detailed what exactly Davani said to her. (Id. at 27). Plaintiff believed that Owens was satisfied with his reaction and left without incident. (Id.). After Owens left Plaintiff's supervision, she returned to Plaintiff's office in tears. (Id. at 33). Owens complained that Davani's comment was still bothering her. (Id.). Plaintiff testified that he told Owens that "it was just friendly, you guys were friendly talking . . . everything is okay." (Id. at 33-34).

Plaintiff is of Iranian descent and claims that Defendant actually fired him because of his national origin. (Doc. No. 1-1). On June 1, 2007, Randy Platts ("Platts") became the Plant Manager at Defendant's facility. (Doc. No. 49 at 3). Plaintiff claims that Platts and other managers made fun of Plaintiff's accent and made jokes about Iranian customs. (Doc. No. 43-2 at 22: Plaintiff Dep.). Another employee, John Otten, testified that he heard Platts refer to Plaintiff as a "camel jockey." (Doc. No. 49-12 at 4: Otten Dep.). Plaintiff also testified that Platts made faces at him. (Doc. No. 43-2 at 52-53: Plaintiff Dep.). According to Plaintiff, Platts

2

yelled at him three times during his employment. (Id. at 53). The first time was on the floor after Platts felt that Plaintiff had messed up a pallet of product. (Id. at 54). The second time, Platts came to Plaintiff's office, closed the door, and yelled at Plaintiff about cleaning up the RGA space. (Id. at 54-55). Later, Platts returned to Plaintiff's office and apologized for yelling. (Id. at 55). Plaintiff testified that Platts also yelled at him in front of other employees that "if you don't do your job, I'm going–you will be the next out the door." (Id. at 22). Plaintiff admitted that Platts was also unpleasant to other employees outside his protected group. (Id. at 55). Despite Plaintiff's difficulties with Platts, Plaintiff requested a pay increase from Platts in 2007. (Id. at 13). Platts gave Plaintiff a $6,100 raise in September 2007, increasing Plaintiff's salary to $57,300. (Id. at 11-13).

In June 2008, Plaintiff complained to Human Resources Director Mary Ellen Bradley ("Bradley") about Platts. (Doc. No. 43-2 at 19). Plaintiff testified that he told Bradley that Platts was "different" with him, insulted Plaintiff, treated him badly, and yelled at him in front of other employees. (Id.). Plaintiff also testified that he told Bradley that Plaintiff believed Platts to be a racist. (Id. at 20). Plaintiff believes that Bradley spoke with Platts about Plaintiff's complaints. (Id. at 23). Plaintiff testified that Platts no longer spoke to him after he complained to Bradley. (Id. at 23). Instead, Platts communicated with Plaintiff over email. (Id.).

Plaintiff then left the country for an emergency trip to Iran to deal with a death in the family. (Id. at 60). Plaintiff was gone from June through July 2008. On July 23, 2008, while Plaintiff was in Iran, Owens met with Bradley and made a complaint about Plaintiff and Davani. (Doc. No. 43-12 at 2-3: Bradley notes). Bradley documented Owens's complaint. (Id.). Bradley testified that Owens said she waited to complain about Plaintiff until he left the country because she was afraid of him. (Doc. No. 43-3 at 38: Bradley Dep.). Owens testified that

3

Plaintiff threatened her on several occasions. (Doc. No. 43-3 at 4: Owens Dep.). Specifically, Owens claims that Plaintiff said, "If you ever come against me one time, I will come against you ten times," and forbade her from talking to anybody about anything. (Id. at 4-5).

Owens told Bradley that her problems with Plaintiff began in 2002. (Id. at 35-37: Bradley Dep.). Owens told Bradley that Plaintiff was "flirty right off the bat." (Id.; Doc. No. 43-12: Bradley Notes). Owens complained that Plaintiff shared his personal and business problems with her, told her that she "must have been a hot chick in [her] day," and asked her out for a drink after work. (Doc. No. 43-3 at 35-36: Bradley Dep.). Owens reported dreams Plaintiff told her he had. (Id. at 36). Owens said that Plaintiff dreamed about Owens, his wife, and himself. (Id.). In these dreams Owens and Plaintiff's wife were wearing long, flowing dresses and holding hands with Plaintiff. (Id.). Owens reported that Plaintiff had told her that he, Owens, and his wife were in bed together in these dreams. (Id.). Owens also reported that whenever Owens had a problem with another employee, Plaintiff would tell her that the other employee was just jealous because Owens was a pretty woman who "carried her body well." (Id. at 37). Owens complained that Plaintiff told her that she was "nicer than [his] fucking wife." (Id.). Plaintiff also reported an incident in which Plaintiff allegedly brushed against Owens's breasts. (Id. at 39-40).

Owens also reported to Bradley that she had taped a conversation between herself and Plaintiff on August 7, 2007. (Id. at 41, 48). Bradley asked Owens to play the tape for her. (Id.). Owens would not give Bradley the tape, but agreed to play it for her a few days later. (Id. at 43-44). Bradley made notes as she listened. (Doc. No. 43-15). In this recorded conversation, Owens complained to Plaintiff about Davani's suggestion that the three of them "get naked together." (Doc. No. 29-7 at 7: Tape Transcript ("Tr.")). Owens also complained that Davani

4

had asked Owens to take her top off. (Id.). Owens told Plaintiff that his descriptions of his dreams bothered her and that she felt they were sexual. (Doc. No. 29-7 at 7: Tape Tr.). Plaintiff told Owens to "let it go" and that it "should not bother her." (Id. at 7-8). Bradley noted that Plaintiff's tone was intimidating. (Doc. No. 43-4 at 48: Bradley Dep.).

After Bradley finished listening to the tape and Plaintiff left her office, Bradley met with Phil Ulrich, Vice President of Talent Management. (Doc. Nos. 43-3 at 47: Bradley Dep.; 43-13 at 2: Ulrich Aff.). Bradley shared her notes of the recorded conversation. (Doc. No. 43-3 at 47: Bradley Dep.). The two discussed their concerns over Plaintiff's intimidating tone and his acknowledgment that Davani had suggested the three get naked together. (Id. at 48). Bradley discovered that despite Plaintiff's sexual harassment training, he failed to report this conversation to Human Resources. (Id. at 53). Bradley and Ulrich were concerned about this failure to report and felt that Plaintiff's behavior was not appropriate for a manager. (Id.). Bradley testified that this is why Defendant terminated Plaintiff's employment. (Id.). Ulrich instructed Bradley to give Plaintiff an opportunity to address their concerns, but that if he did not have a reasonable explanation for what was on the tape, Bradley should terminate his employment. (Id.).

When Plaintiff returned from Iran, Bradley called him to a meeting with her and Platts. (Id. at 55). Bradley informed Plaintiff that it had come to their attention that someone had reported sexual harassment to him. (Id.). Bradley asked Plaintiff whether he reported Owens's complaint to Human Resources. (Doc. No. 43-2 at 40: Plaintiff Dep.). Bradley read Plaintiff several portions of her notes on the recorded conversation. (Doc. No. 43-3 at 55: Bradley Dep.). Plaintiff said that Owens was setting him up. (Id.).

5

Bradley fired Plaintiff at the end of their meeting. (Doc. No. 43-3 at 57). Bradley told Plaintiff "that while the investigation did not rise to the level of sexual harassment, the recorded conversations demonstrated exceptionally poor judgment that could not be tolerated by any supervisor at Cooper Industries." (Id.).

## II. SUMMARY JUDGMENT

### A. Standard of Review

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. That party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. Instead, that party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party."

Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S. Ct. 2658, 2677 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

B. Analysis

In his Complaint, Plaintiff alleged discrimination and harassment because of his national origin and age in violation of Title VII, 42 U.S.C. § 1981, and the Age Discrimination in Employment Act. (Doc. No. 1-1 at 7). He further alleged his termination was in retaliation for complaints he made two months before his termination about this alleged discrimination and harassment in violation of Title VII. (Id. at 8). Finally, he brought a state law claim for wrongful discharge under North Carolina General Statutes § 143-422.2. (Id.). Plaintiff filed a Charge of Discrimination before the Equal Employment Opportunity Commission ("EEOC") covering all of these allegations. (Doc. No. 43-16). On April 30, 2010, the EEOC issued a no cause finding and a right to sue letter. (Doc. No. 43-17). Plaintiff brought suit within 90 days of receiving this notice. (Doc. No. 1-1).

Defendant spent ten pages of its summary judgment briefing demonstrating its entitlement to summary judgment on Plaintiff's national origin harassment claim. (Doc. No. 43 at 21-31). Plaintiff did not respond to this argument. (Doc. No. 49). Plaintiff defended only his claim "that he was discharged because of his national origin or in retaliation for his complaints of national origin [harassment] or a combination of these two impermissible factors." (Id. at 16).

Therefore, the Court finds that Plaintiff has abandoned his harassment claims and age discrimination claim. (Id.); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 n.3 (holding that the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial" once the moving party has satisfied its initial burden).

1. Retaliatory Discharge

North Carolina law does not recognize a retaliation claim. "While this provision [of the NCEEPA] clearly pronounces the State's public policy, it provides no remedy for its violation." Strickland v. Jewell, 562 F. Supp. 2d 661, 674 (M.D.N.C. 2007); see also McLean v. Patten Communities, Inc., 332 F.3d 714, 719 (4th Cir. 2003) ("there is no private right of action under North Carolina law for retaliation under [the NCEEPA]"). Therefore, Plaintiff's North Carolina state law illegal retaliation claim is **DISMISSED**.

The elements of proving retaliation are the same under Title VII and section 1981. See Spriggs v. Diamond Auto Glass, 242 F.3d 179, 184 (4th Cir. 2001) (Title VII and section 1981 share common elements). Plaintiff lacks any direct evidence of retaliation, so the Court must analyze his claim under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973).

"The test for proving *prima facie* retaliatory discharge requires that (1) plaintiff engaged in protected activity, such as filing an EEO[C] complaint; (2) the employer took adverse employment action against plaintiff; and (3) a causal connection existed between the protected activity and the adverse action." Carter v. Ball, 33 F.3d 450, 460 (4th Cir. 1994); see also Laughlin v. Metropolitan Washington Airports Auth., 149 F.3d 253, 259 (4th Cir. 1998) (barring retaliation for "opposing discriminatory practices in the workplace").

> If a prima facie case is presented, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Assuming the employer meets this burden of production, the McDonnell Douglas framework-with its presumptions and burdens-disappears, and the sole remaining issue is discrimination *vel non*. In other words, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons were not its true reasons, but were a pretext for discrimination. At this point, the burden to demonstrate pretext merges with the ultimate burden of persuading the court that the plaintiff has been the victim of intentional discrimination.

Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004) (internal citations and quotations omitted).

Defendant concedes that Plaintiff has met the first two parts of his prima facie case. (Doc. No. 43 at 32). As Defendant notes, "Plaintiff engaged in protected activity by making a complaint of discrimination to Bradley in June 2008 and he suffered an adverse employment action when he was terminated in August 2008." (Id. at n.14). Defendant argues that Plaintiff has not established a causal connection between Plaintiff's complaint of discrimination and his firing. (Id.).

Defendant fired Plaintiff approximately two months after he complained about Platts's harassment to Bradley. A close temporal connection between protected activity and adverse employment action can be sufficient to meet this initial prima facie burden. Williams v. Cerberonics, Inc., 871 F.2d 452, 455, 457 (4th Cir. 1989) ("While [proof of an adverse employment action within two months of protected activity] far from conclusively establishes the requisite causal connection, it certainly satisfies the less onerous burden of making a prima facie case of causality"). But in King v. Rumsfeld, the Fourth Circuit found that a period of two months and two weeks was "sufficiently long so as to weaken significantly the inference of causation between the two events. 328 F.3d 145, 151 n.5 (4th Cir. 2003). In Ford v. General

9

Electric Lighting, LLC, the court found that even where a plaintiff could show a two month period between protected activity and firing, causation would be lacking where intervening misconduct occurs for which the employer claims to have fired the plaintiff. No. 5:03-cv-24, 2004 WL 1280679, at *2 (W.D. Va. Feb. 6, 2004).

While the two month period between Plaintiff's complaint and his firing might otherwise come close to satisfying Plaintiff's prima facie causation burden, Owens's intervening complaint about Plaintiff negates the importance of the timing of Plaintiff's June complaint. Plaintiff has not presented any other evidence on causation. Therefore, the Court finds that Plaintiff has failed to establish his prima facie case of retaliatory termination.

Even if Plaintiff had met this burden, though, the Court would still be forced to dismiss his case. Defendant met its burden to "articulate some legitimate, nondiscriminatory reason for the employee's [termination]" and Plaintiff failed to show Defendant's reason was pretext. McDonnell Douglas, 411 U.S. at 802; Hill, 354 F.3d at 285.

Defendant fired Plaintiff for his failure to follow Defendant's harassment policy and "while the investigation did not rise to the level of sexual harassment, the recorded conversations demonstrated exceptionally poor judgment that could not be tolerated by any supervisor at Cooper Industries." (Doc. No. 43-3 at 53, 57). This is a neutral, non-retaliatory reason for firing Plaintiff. Plaintiff did not present evidence that these stated reasons were not the true reasons he was fired. The temporal proximity between his termination and his complaints about Platts carries even less weight in this part of the McDonnell Douglas inquiry. See King, 328 F.3d at 154 (affirming summary judgment despite such close timing between protected activity and termination to satisfy prima facie causation requirement).

Plaintiff argues that "the certifiably strange way Cooper went about dismissing [Plaintiff]

and its efforts to shift its rational[e] for the termination" show Defendant's stated reason is pretext. (Doc. No. 49 at 20). The Fourth Circuit has held that an employer's changing rationale for making an adverse employment decision can be evidence of pretext. EEOC v. Sears Roebuck and Co., 243 F.3d 846, 853 (4th Cir. 2001). Defendant's neutral explanations, however, have never changed. Defendant has always asserted that it fired Defendant for his poor judgment in both his conversations with Owens and in his failure to report her sexual harassment complaint. (Doc. No. 43-3 at 53, 57).

Plaintiff alleges that Defendant later changed its rationale to include his "inappropriate communications with a subordinate and lying about it." (Doc. No. 49 at 17). Plaintiff cites Defendant's response to the EEOC to show Defendant's allegedly novel rationale. (Id.). However, this exhibit shows the Defendant explaining to the EEOC that Plaintiff "engaged in inappropriate conduct in the workplace which ultimately merited his termination for legitimate non-discriminatory, non-retaliatory reasons." (Doc. No. 49-4 at 2). Plaintiff also filed a letter Bradley sent to the EEOC. (Doc. No. 49-3: October 3, 2008 letter). In this letter, Bradley detailed all facts surrounding Plaintiff's termination. (Id.). Bradley stated that "Mr. Safari's inappropriate discussions with his subordinate and his lack of forthrightness during the investigation led to the decision to terminate Mr. Safari's employment." (Id. at 3). But then Bradley concluded that Plaintiff was terminated because "the recorded conversations demonstrated exceptionally poor judgment that could not be tolerated by any superior at Cooper Industries." (Id.). Defendant did not change its reasoning for terminating Plaintiff's employment.

There also does not appear to be anything "certifiably strange" about Defendant's investigation. Plaintiff complains that Defendant did not: (1) contact Davani or other employees

to see whether Owens's complaints were true, (2) determine when Plaintiff allegedly discussed his dreams with Owens, (3) discover that Owens was friendly with Davani, (4) ask Owens whether she reported her harassment to any other employee, (5) require Owens to hand over her tape, or (6) investigate Owens's disciplinary history. (Doc. No. 49 at 9-12). None of these complaints are well founded. Bradley heard direct evidence of Plaintiff's mishandling of Owens's sexual harassment complaints and inappropriate behavior with a subordinate, gave Plaintiff an opportunity to present an alternative explanation, and fired him when he did not. There was nothing strange about Defendant's investigation. Plaintiff has not presented a triable issue on pretext.

Moreover, the Fourth Circuit has rejected similar insufficient investigation arguments. In Bonds v. Leavitt, the Circuit found that "[e]ven if [the employer's] investigations were improper or substandard, that does little to help [the plaintiff] establish that the reasons given for [the plaintiff's] termination were not the actual reasons, and it certainly does not give rise to a reasonable inference that [the plaintiff's] race or gender was the real reason for her termination." 629 F.3d 369, 386 (4th Cir. 2011). But see O'neill v. Henderson Cnty. Hosp. Corp., No. 1:04-cv-68, 2005 WL 3797394, at *4 (W.D.N.C. June 21, 2005) (finding that while the validity of the employer's investigation is not directly probative, an employer's blind eye to alternative explanations or failure to investigate other possibilities is evidence of pretext).

Even if Plaintiff had established a prima facie case for a retaliatory discharge, his case would be dismissed due to his failure to present evidence that Defendant's neutral explanation was not the true reason for his termination. Therefore, Plaintiff's retaliatory discharge claims under Title VII and section 1981 are **DISMISSED**.

        2.        Discriminatory Discharge

The elements of proving Plaintiff's termination was the result of national origin discrimination are the same under Title VII, section 1981, and the NCEEPA. See Spriggs v. Diamond Auto Glass, 242 F.3d 179, 184 (4th Cir. 2001) (Title VII and section 1981 share common elements); N.C. Dep't of Corr. v. Gibson, 301 S.E.2d 78, 85 (N.C. 1983) (NCEEPA claims are evaluated under Title VII framework). Where, as here, Plaintiff lacks any direct evidence of discrimination, the Court must analyze his claim under the McDonnell Douglas framework detailed above. To prove his prima facie case of discriminatory termination, Plaintiff must show that:

> (1) he is a member of a protected class, (2) he suffered an adverse employment action (such as discharge), (3) he was performing his job duties at a level that met the employer's legitimate expectations at the time of the adverse employment action, and (4) his position remained open or was filled by a similarly qualified applicant outside the protected class.

Baqir v. Principi, 434 F.3d 733, 742 (4th Cir. 2006) (internal citation omitted).

Even assuming that Plaintiff could establish this prima facie case, the Court must dismiss his action for the same reasons noted above. Defendant put forward a legitimate, non-discriminatory reason for firing Plaintiff. As discussed above, Plaintiff failed to present evidence that this reason was pretext. Therefore, his discriminatory discharge claims under Title VII, section 1981, and the NCEEPA are **DISMISSED**.

### III. MOTION TO DISMISS

Because the Court is granting Defendants' Motion for Summary Judgment, the Court need not decide Defendant's Motion to Dismiss. Defendant's Motion to Dismiss, (Doc. No. 29), is **DISMISSED as moot.**

## IV.  CONCLUSION

Plaintiff waived all but his claims "that he was discharged because of his national origin or in retaliation for his complaints of national origin [harassment] or a combination of these two impermissible factors." (Doc. No. 49 at 16).  Plaintiff's North Carolina state law illegal retaliation claim is **DISMISSED** because there is no private right of action under North Carolina law for retaliation.  McLean v. Patten Communities, Inc., 332 F.3d 714, 719 (4th Cir. 2003).  Plaintiff's retaliatory discharge claims under Title VII and section 1981 are **DISMISSED** because he failed to establish a prima facie case.  Plaintiff's discriminatory discharge claims under Title VII, section 1981, and the NCEEPA are **DISMISSED** because he failed to present evidence that Defendant's neutral, non-discriminatory reason for terminating his employment was pretext for discrimination.  Because the Court is dismissing Plaintiff's case on summary judgment, Defendant's Motion to Dismiss, (Doc. No. 29), is **DISMISSED as moot**.

**IT IS, THEREFORE, ORDERED** that:

1. Defendant's Motion for Summary Judgment, (Doc. No. 42), is **GRANTED**;
2. Defendant's Motion to Dismiss, (Doc. No. 29), and the Magistrate Judge's M&R recommending that this Court deny the motion, (Doc. No. 38), are **DISMISSED as moot**; and
3. Plaintiff's case is **DISMISSED**.

Signed: April 13, 2012

Robert J. Conrad, Jr.
Chief United States District Judge